

"Eighth Circuit U.S.
Court of Appeals Clerks
Office"
<mjones@ck8.uscourt
s.gov>

01/24/02 10:23 AM

To: "James R. Rosenbaum" <Donnell_Vance@iasd.uscourts.gov>
cc:
Subject: Opinion for Case 00-3906

**FILED**

JAN 24 2002

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

Please find the attached opinion for case 00-3906

☐

Michael E. Gans
Clerk of Court

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
Thomas F. Eagleton Court House
Room 24.329
111 S. 10TH Street
St. Louis, Missouri 63102

January 24, 2002

VOICE (314)244-2400
FAX (314)244-2780
www.ca8.uscourts.gov

Mr. Jon R. Muth
MILLER & JOHNSON
250 Monroe Street
800 Calder Plaza Building
Grand Rapids, MI  45906

4'99-cv. 10671

        Re:  00-3906   USA, et al. vs. Dico, Inc.

Dear Counsel:

    The court today issued an opinion in this case. Judgment in
accordance with the opinion was also entered today.

    Please review Federal Rules of Appellate Procedure and the
Eighth Circuit Rules on post-submission procedure to ensure that any
contemplated filing is timely and in compliance with the rules.  Note
particularly that petitions for rehearing and petitions for rehearing
en banc must be received in the clerk's office within 45 days of
the date of the entry of judgment.  No grace period for mailing is allowed,
and the date of the postmark is irrelevant.  Any petition for rehearing
or petition for rehearing en banc which is not received within the
45 day period for filing permitted by FRAP 40 may be denied as untimely.

(5148-010199)

                        Michael E. Gans
                        Clerk of Court

cmd

Enclosure(s)

cc:  Gary Lee Hayward
     David Fishel
     Mark R. Haag
     Edward Warren Remsburg
     Nancy Saunders
     Daniel E. Vineyard
     Deborah M. Tharnish

4.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 00-3906

---

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| BP Amoco Oil PLC; BP Amoco PLC; | * | |
| Chevron Chemical Company; Bayer | * | Appeal from the United States |
| Corporation; Monsanto Company; | * | District Court for the |
| Shell Oil Company, | * | Southern District of Iowa |
| | * | |
| Defendants-Appellees. | * | |
| | * | |
| DICO, Inc., | * | |
| | * | |
| Intervenor-Appellant. | * | |

---

Submitted: June 13, 2001

Filed: January 24, 2002

---

Before McMILLIAN and RICHARD S. ARNOLD, Circuit Judges,  and
ROSENBAUM,[1] District Judge.

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

McMILLIAN, Circuit Judge.

The United States of America ("the government"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), brought the present action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, in the United States District Court[2] for the Southern District of Iowa, against BP Amoco Oil PLC, BP Amoco PLC, Chevron Chemical Company, Bayer Corporation, Monsanto Company, and Shell Oil Company, seeking reimbursement of costs incurred by the government in cleaning up a site located in Des Moines, Iowa, contaminated with trichloroethylene ("TCE") and other hazardous substances. Dico, Inc. ("Dico"), an intervenor in the action, now appeals from a final order of the district court granting the government's motion to enter a proposed consent decree ("the consent decree"), denying Dico's request for an evidentiary hearing on the government's motion to enter the consent decree, and denying Dico's motion to consolidate this action with Dico v. Amoco Oil Co., No. 4-97-10130 (S.D. Iowa 1997) ("the contribution action"). United States v. BP Amoco Oil PLC, No. 4-99-10671 (S.D. Iowa Sept. 29, 2000) ("slip op."). For reversal, Dico argues that the district court (1) abused its discretion and violated Dico's constitutional rights in failing to hold an evidentiary hearing and (2) abused its discretion in approving and entering the consent decree. For the reasons set forth below, we affirm.

Jurisdiction was proper in the district court based upon 28 U.S.C. § 1331. Jurisdiction is proper in this court based upon 28 U.S.C. § 1291. The notice of appeal was timely filed pursuant to Fed. R. App. P. 4(a).

---

[2]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

## Background

The following is a summary of the factual and procedural background, as set forth in the district court's order of September 29, 2000. <u>See</u> slip op. at 1-5.

In 1974, TCE was detected in water coming from underground wells located near property owned by Dico and maintained by the Des Moines Water Works. The EPA designated the area the "Des Moines TCE Site" and placed it on the national priority list. The Des Moines TCE Site was divided into several "operable units." Operable Unit-2 ("OU-2") and Operable Unit-4 ("OU-4") (together "OU-2/4") are within Dico's property. Each was found to be contaminated with TCE, and OU-4 was also found to be contaminated with herbicides and pesticides.

Dico's corporate predecessor, Di-Chem, had operated a chemical formulation business on the Dico property until the 1970s. In 1994, pursuant to two Unilateral Administrative Orders issued by the EPA, Dico conducted two removal actions at OU-2/4. A group of former customers of Di-Chem (BP Amoco Oil PLC, BP Amoco PLC, Chevron Chemical Co., Bayer Corp., Monsanto Co., and Shell Oil Co.) conducted a third removal action pursuant to an Administrative Order on Consent. The EPA also incurred costs associated with the removal actions at OU-2/4.

In 1996, the EPA signed a Record of Decision ("ROD"), which confirmed the completion of the three removal actions at OU-2/4. The former Di-Chem customers requested settlement negotiations with the government regarding the costs associated with the OU-2/4 cleanup efforts. Pursuant to CERCLA, 42 U.S.C. § 9622(e)(3), the EPA undertook a nonbinding preliminary allocation of responsibility ("NBAR") and allocated 61% of the responsibility to Dico and 39% to the former Di-Chem customers collectively. In April 1998, the EPA formally notified the former Di-Chem customers and Dico that they were potentially responsible parties ("PRPs") and provided them each with copies of the NBAR and a proposed consent decree. The

-3-

PRPs were also notified that settlement with the government would provide protection from liability in the contribution action brought by Dico, arising out of the same remediation. Dico did not respond to the letter and did not participate in the settlement negotiations, despite repeated invitations by the government to do so. On November 2, 1998, when an agreement was imminent between the government and the former Di-Chem customers, the government sent Dico a reminder that a final consent decree would include contribution liability protection for the "settling defendants."

On November 29, 1999, the government filed the present action in the district court and simultaneously lodged the proposed consent decree, as signed by the government and the former Di-Chem customers (hereinafter referred to as "the settling defendants"). As required by CERCLA, 42 U.S.C. § 9622(d)(2), the consent decree was published in the Federal Register, in response to which Dico submitted objections and comments. Dico also moved in the district court to intervene in the present action and to consolidate it with the contribution action, which it had filed against the settling defendants in 1997. The district court granted Dico's motion to intervene, but deferred ruling on Dico's motion to consolidate the two actions.

On March 10, 2000, the government formally moved to enter the consent decree. Dico requested an evidentiary hearing on the government's motion to enter the consent decree, arguing that (1) a hearing was necessary because the government had failed to provide a fair and complete record and (2) it had a vested property interest in the contribution action, which, under the Fifth Amendment, could not be "taken" without due process (i.e., an evidentiary hearing) and just compensation.

Upon review of the parties' submissions, the district court entered the order from which Dico now appeals. The district court denied Dico's request for an evidentiary hearing, reasoning that a hearing was not necessary to supplement the record because Dico had been provided sufficient opportunities to supplement the

record before and after the consent decree had been lodged in the district court. See slip op. at 5-9. The district court also rejected Dico's assertion of a constitutional right to an evidentiary hearing, reasoning that Dico never had a right to contribution because its statutory contribution claim was at all times limited by 42 U.S.C. § 9613(f)(2) ("A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."). See id. at 8-9. Next, the district court granted the government's motion to enter the consent decree. Upon careful consideration of the parties' arguments and the record before it, the district court concluded that the consent decree had resulted from a fair process, that it was substantively fair, and that it was reasonable and consistent with CERCLA. See id. at 9-17. The district court then denied as moot Dico's motion to consolidate the contribution action with the action at bar. See id. at 17.

Judgment was entered accordingly, and Dico appealed. Both the government and the settling defendants oppose Dico's appeal.

## Discussion

*Denial of Dico's motion for an evidentiary hearing*

Dico first argues that the district court improperly denied its motion for an evidentiary hearing. Dico contends that the administrative record was incomplete, biased, and inaccurate, and that an evidentiary hearing was the only meaningful way for Dico to rebut the government's evidence. Dico asserts, among other things, that the district court erroneously relied on the settlement process as a basis for concluding that Dico had been given an opportunity to supplement the record. On the contrary, Dico argues, the settlement process offered nothing more than an opportunity for Dico to bargain away its contribution rights. Dico also points out that it was notified of the potential settlement between the government and the settling

defendants only after Dico had already invested approximately $5.7 million in response costs and $300,000 in litigation costs. Therefore, Dico argues, its refusal to participate in the settlement negotiations was justified. Dico further maintains that a hearing was necessary to examine the evidentiary basis for a nine-page sworn statement by Daniel Shiel, an EPA attorney, whose statement was submitted by the government in support of its motion for entry of the consent decree. Shiel's statement (hereinafter "the Shiel declaration") purported to explain, among other things, the government's methodology in assigning 61% and 39% of the responsibility to Dico and the settling defendants, respectively, using eight specific factors.[3] According to Dico, the Shiel declaration was the government's primary evidence in support of the EPA's 61/39 liability allocation, the Shiel declaration did not include or identify supporting documentation, and Dico was entitled to examine Shiel under oath regarding the bases for his assertions. Likewise, Dico contends, the government's allegations of costs were not adequately supported by the evidence in the record and therefore should have been subjected to examination, which only an evidentiary hearing could have adequately provided.

---

[3]The district court set forth the eight factors used in the EPA's analysis as follows:

> 1) distinguishable costs (based on specific wastes of specific waste types); 2) degree of involvement in management or operations at the facility; 3) degree of care (including measures taken by a party to prevent or minimize contamination); 4) fault (culpability and actual cause of the contamination); 5) degree of cooperation (degree to which a PRP cooperates or assists in cleanup efforts); 6) financial capability (whether the PRP is financially viable); 7) financial benefits derived from waste-producing activity; and 8) financial benefits derived from remediation.

United States v. BP Amoco Oil PLC, No. 4-99-10671, slip op. at 11 n.4 (S.D. Iowa Sept. 29, 2000) (citing NBAR Guidance, published at 52 Fed. Reg. 19919 (May 28, 1987)).

Alternatively, Dico argues that its constitutional rights were violated as a result of the district court's denial of its motion for an evidentiary hearing. Dico maintains that it paid well more than its fair share of the remediation costs and also notes that it filed its contribution claim before the government ever sought to have the consent decree entered. Therefore, Dico contends, at the time it filed its motion for an evidentiary hearing, its contribution claim had become a vested property interest,[4] which could not be "taken" without just compensation and due process of the law, as recognized in Mathews v. Eldridge, 424 U.S. 319, 349 (1976) (due process requires that procedures be tailored, in light of the decision to be made, to ensure a meaningful opportunity to be heard).

We review the district court's denial of Dico's request for an evidentiary hearing for an abuse of discretion. United States v. Union Elec. Co., 132 F.3d 422, 430 (8th Cir. 1997) (Union Electric) (quoting United States v. Metropolitan St. Louis Sewer Dist., 952 F.2d 1040, 1044 (8th Cir. 1992) ("It is within the sound discretion of the trial court to decide whether an evidentiary hearing is necessary before ruling on a proposed consent decree.")). We agree with the district court that Dico was given a meaningful and sufficient opportunity to present arguments and submit evidence in opposition to the government's motion to enter the consent decree.

---

[4]In support of its argument that it had a vested property interest in its contribution claim, Dico cites 42 U.S.C. § 9657, which provides in part:

> If an administrative settlement under section 9622 of this title has the effect of limiting any person's right to obtain contribution from any party to such settlement, and if the effect of such limitation would constitute a taking without just compensation in violation of the fifth amendment of the Constitution of the United States, such person shall not be entitled, under other laws of the United States, to recover compensation from the United States for such taking, but in any such case, such limitation on the right to obtain contribution shall be treated as having no force and effect.

Therefore, while Shiel's live testimony might have been helpful in this context, we cannot say that it was an abuse of discretion for the district court to decide that an evidentiary hearing was not necessary. <u>Accord</u> <u>United States v. Cannons Engineering Corp.</u>, 899 F.2d 79, 93-94 (1st Cir. 1990) (<u>Cannons Engineering</u>) (holding that district court did not abuse its discretion in declining to hold evidentiary hearing on government's motion for entry of consent decrees).

We further conclude that Dico's constitutional argument is without merit. To begin, we agree with the district court that Dico did not have a right to contribution at the time the government moved for entry of the consent decree. The basis for Dico's statutory contribution claim against the settling defendants is § 9613(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title . . ."), which is subject to and limited by § 9613(f)(2) ("A person who has resolved its liability to the United States . . . in [a] judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."). In other words, Dico never had a vested property interest to be taken.[5] Moreover, an evidentiary hearing would not have been required as a matter of due process. Due process is a "flexible concept that varies with the particular situation," and its "fundamental requirement . . . is the opportunity to be heard at a meaningful time and in a meaningful manner." <u>Winegar v. Des Moines Independent Community Sch. Dist.</u>, 20 F.3d 895, 899-900 (8th Cir. 1994) (citing <u>Zinermon v. Burch</u>, 494 U.S. 113, 127 (1990); <u>Mathews v. Eldridge</u>, 424 U.S. at 333), <u>cert. denied</u>, 513 U.S. 964 (1994). Due process does not always require an evidentiary hearing, even where a significant interest is at stake. <u>See, e.g.,</u> <u>United States v. Papajohn</u>, 701 F.2d 760, 763 (8th Cir. 1983) (due process does not mandate an evidentiary hearing to establish the accuracy of a presentence investigation report before such report can be considered by district court for

---

[5]Because Dico did not have a vested property interest to be "taken," 42 U.S.C. § 9657 was not implicated by the district court's decision.

sentencing purposes).  As we have stated, Dico was, in any event, given a meaningful opportunity to be heard.

*Grant of the government's motion to enter the consent decree*

Dico next contends that the district court improperly granted the government's motion for entry of the consent decree.  Dico maintains that the consent decree is fatally flawed in all essential respects: procedural and substantive fairness, reasonableness, and consistency with the meaning and purposes of CERCLA.  See Cannons Engineering, 899 F.2d at 85 ("Reasonableness, fairness, and fidelity to the statute are . . . the horses which district judges must ride.").

Dico argues that the consent decree resulted from a procedurally unfair settlement process.  Dico disputes the district court's reasoning that Dico, having refused to participate in the settlement negotiations despite the government's repeated invitations, was foreclosed from arguing that the settlement process was unfair.  On the contrary, Dico again argues, the entire process was fundamentally unfair from the beginning and therefore Dico was justified in refusing to participate.  According to Dico, it had already paid the vast majority of the response costs for OU-2/4 when the government invited it to participate in the negotiations, upon the express assumption that any resulting consent decree would give the "settling defendants" protection from contribution liability to Dico.  That offer of contribution protection made by the government to the other PRPs, Dico argues, was unnecessary and fundamentally unfair to Dico.

Dico further argues that the consent decree is substantively unfair.  Dico cites Cannons Engineering, 899 F.2d at 87, for the proposition that, to be substantively fair, settlement terms must be "based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm

-9-

each PRP has done." Dico maintains that the EPA lacked a rational basis for: (1) assigning Dico 61% responsibility for the overall OU-2/4 response costs compared with 39% responsibility assigned to the settling defendants, (2) assigning to Dico the entire amount of "volatile organic chemicals" (VOC) remediation and oversight costs, and (3) including complete protection for the settling defendants from contribution liability to Dico.  Dico contends that the district court merely rubber stamped the EPA's actions by wholly adopting Shiel's unsubstantiated and contradicted conclusory allegations which purported to justify the consent decree based upon the eight factors: distinguishable costs, degree of involvement, degree of care, fault, degree of cooperation, financial capability, financial benefit from waste-producing activities, and financial benefits from the remediation.  Regarding distinguishable costs, Dico argues that the district court blindly adopted Shiel's claim that Dico should pay 100% of the VOC remediation costs, even though the NBAR allegedly suggested that those costs were indistinguishable from costs for which the settling defendants were responsible.  Regarding degree of involvement and financial benefit from the waste-producing activities, Dico argues that the evidence in the record does not show that either Dico or any of its corporate predecessors conducted or benefitted from the formulation process, while the settling defendants were arrangers of the formulation process and thus were more involved in, and benefitted more from, the generation of hazardous wastes.  As to Dico's degree of care and fault, Dico argues that short term releases and flooding at the OU-2/4 area caused contamination for which Dico cannot be blamed.  As to the degree of cooperation, Dico contends that the district court ignored Dico's removal actions and only considered its decision not to participate in the settlement negotiations.  Regarding relative financial capabilities, Dico argues that, contrary to the EPA's and the district court's apparent assumptions, the settling defendants have vastly greater resources than Dico.  Finally, as to financial benefits, Dico suggests that it has suffered more of a loss than a benefit because it has already paid the vast majority of the response costs.  Dico thus concludes that the district court abused its discretion in holding that the consent decree fairly allocates liability among the parties.

-10-

Finally, Dico argues that the consent decree is manifestly unreasonable and inconsistent with the underlying objectives of CERCLA. Dico contends that, in this particular case, the consent decree penalizes the party that forthrightly remediated at its own expense, takes undue advantage of the party with the weaker bargaining strength, and awards the government costs to which it is not entitled. Therefore, Dico continues, the consent decree violates CERCLA's objectives by sending the message that contribution rights are illusory and the best strategy to minimize one's exposure is outright refusal to incur any response costs. The end result, Dico concludes, will be to discourage prompt and efficient cleanup efforts, to undercut PRP confidence in the CERCLA process, and to render meaningless contribution rights under 42 U.S.C. § 9613(f)(1).

We review the district court's decision to grant the government's motion to enter the consent decree for an abuse of discretion. Union Electric, 132 F.3d at 430. We will not reverse unless Dico has shown that the district court committed a material error of law or a "'meaningful error in judgment.'" Cannons Engineering, 899 F.2d at 84 (quoting Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)). In the present case, the district court's order granting the government's motion for entry of the consent decree reveals to us that the district court carefully considered the underlying facts and legal arguments and did not mechanistically "rubber stamp" the consent decree, as Dico suggests. We therefore exercise restraint on review – because we are deferring both to the EPA's inherent experience and expertise in handling such matters and to the district court's carefully-exercised informed discretion. Id. ("on appeal, a district court's approval of a consent decree in CERCLA litigation is encased in a double layer of swaddling"), quoted in Union Electric, 132 F.3d at 430. Dico therefore bears a heavy burden to establish a basis for reversal. See Cannons Engineering, 899 F.2d at 84 ("The doubly required deference . . . places a heavy burden on those who purpose to upset a trial judge's approval of a consent decree.").

-11-

To begin, we cannot agree with Dico's claims that the settlement process was inherently unfair and that Dico was justified in refusing to participate because its contribution rights were at stake. Nothing in the record suggests that the government and the settling defendants were not negotiating in good faith and at arm's length. See id. (respect for agency's role is heightened where "the cards are dealt face up" and parties with conflicting interests "hammer out an agreement at arm's length"). Moreover, Dico failed even to make a good faith effort to participate in the negotiations. Dico had the opportunity, through the settlement process, to express and defend its position and to seek reimbursement of past expenditures; by contrast, Dico's refusal even to come to the table precluded its position from ever being heard or considered. As for Dico's claim that it was not necessary for the EPA to offer the settling defendants protection against exposure to contribution liability, that assertion is debatable,[6] but, in any event, beside the point. By providing contribution protection to the settling defendants, the government neither exceeded nor abused its authority. Indeed, providing protection from exposure to duplicate liability promoted fairness in the overall process.

We next consider the substantive fairness of the consent decree, a matter particularly appropriate for our deferential review. "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which is it legally responsible." Id. at 87. In the present case, we agree with the district court's conclusion that the consent decree reflects a

---

[6]42 U.S.C. § 9613(f)(2) provides:

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potentially liability of the others by the amount of the settlement.

reasonable allocation of legal responsibility between Dico and the settling defendants. Dico was not inappropriately assigned complete responsibility for the VOC-related costs, because those costs were found to be related to operations of Dico or one of its corporate predecessors, but could not be traced to the settling defendants. See slip op. at 11-12. As the district court concluded, the costs resulting from pesticide contamination were reasonably split between Dico and the settling defendants. See id. at 12. Regarding the parties' relative roles in managing the pertinent operations, the relative degree of care they exercised, their relative fault, and the relative benefits to them from the waste-producing activity, we agree with the district court that there is factual and evidentiary support for the EPA's decision to assign most of the responsibility to Dico, as the "entity in charge of the facility." See id. at 12-13. As to factors such as the degree of cooperation and the benefit of the remediation to the parties, we note that Dico conducted the first and second removal actions at OU-2/4 only after the EPA obtained unilateral administrative orders commanding Dico to do so. See id. at 13. By contrast, the third removal action was performed by the settling defendants pursuant to an administrative consent order. Each of the three removal actions benefitted Dico, as the owner of the property. Finally, although the exact amounts of response costs incurred by the parties are subject to debate, it appears from the record that Dico's share constitutes significantly less than the 90% Dico claims.

Finally, we reject Dico's assertions that the consent decree is manifestly unreasonable and inconsistent with CERCLA. Regarding Dico's argument based upon the contribution protection provided to the settling defendants, we emphasize that such protection is explicitly authorized under 42 U.S.C. § 9613(f)(2). Moreover, the contribution protection is reasonable and consistent with the underlying policies and goals of CERCLA because it prevents duplicate liability and encourages cooperation with the government, thereby serving the goals of efficient and effective environmental cleanup and regulation.

-13-

In sum, we hold that the district court did not abuse its discretion in entering the consent decree upon determining that it is sufficiently fair, reasonable, and consistent with CERCLA.

### Conclusion

The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-14-